**State v. D'Ambrosio**
*[Cite as 5 AOA 183]*

*Case No. 57448*
*Cuyahoga County, (8th)·*
*Decided August 30, 1990*

John T. Corrigan, Prosecuting Attorney of Cuyahoga County, Carmen M. Marino, Assistant, The Justice Center, 1200 Ontario, Cleveland, Ohio 44113, for Plaintiff-Appellee.

Paul Mancino, Jr., 75 Public Square Building, Suite 1016, Cleveland, Ohio 44113, for Defendant-Appellant.

KRUPANSKY, P.J.

Defendant, Joe D'Ambrosio, was indicted[1] in the Cuyahoga County Court of Common Pleas case number CR-232189 on four counts, viz.; two counts of violating R.C. 2903.01, aggravated murder with a felony murder specification; one count of violating R.C. 2905.01, kidnapping; one count of violating R.C. 2911.11, aggravated burglary.

Defendant pleaded not guilty and executed a written waiver to a jury trial. A three-judge panel tried the case. At the close of the state's case defendant moved for acquittal pursuant to Crim. R. 29, however, the Crim. R. 29 motion was overruled. Defendant presented his case, after which he renewed his Crim. R. 29 motion. The motion was again denied.

On February 10, 1989, by agreement of counsel, the verdict of the three-judge panel was to be sealed until February 21, 1989. The delay was due to one of the panel judge's participation in the Keenan case. The judge wanted to allow the Keenan jury to finish the penalty phase before the verdict *sub judice* was announced. On February 21, 1989 the court pronounced defendant guilty on all four counts. A mitigation hearing was then held. In an entry journalized February 24, 1989, the panel unanimously found the aggravating circumstances of the crime outweighed any mitigating factors.

Therefore, defendant was sentenced to death in the electric chair on both counts one and two. Defendant was also sentenced for a term of ten years to twenty-five years on count three, ten years actual incarceration; ten to twenty-five years on count four, ten years actual incarceration. Counts three and four are to run consecutively. Defendant filed a timely notice of appeal.

The following facts were adduced at trial:
"Defendant and Edward Espinoza were employed as landscapers by Thomas Michael Keenan a co-defendant. On or about Friday, September 23, 1988, the three men stopped for a drink at a bar known as 'The Saloon' located on Coventry and Mayfield Roads in Cleveland Heights. Also present in The Saloon was Paul "Stoney" Lewis. Lewis had previously done work for Keenan but apparently had not been paid. Lewis and Keenan went outside to discuss the matter. After sitting in Keenan's truck and smoking a marijuana joint, the two reached an agreement whereby Keenan would pay off the debt by giving Lewis cocaine and marijuana."

Lewis and Keenan left The Saloon, going down the street to another bar named "Coconut Joe's." Approximately twenty minutes later Espinoza and defendant entered Coconut Joe's. Also present at the bar was Anthony Klann who became the victim. Inside Coconut Joe's, Klann and Espinoza apparently became engaged in an argument. Espinoza was asked to leave the bar, and did so accompanied by Keenan and defendant. Klann was advised to remain at Coconut Joe's until things calmed down, thereafter, he left. Lewis left Coconut Joe's at closing time and went with another friend to the home of one of the barmaids.

Defendant and Espinoza started walking toward defendant's apartment. Keenan had gotten into his truck and drove alongside the two. Keenan claimed Lewis had stolen drugs, money and business records from him and enlisted the aid of defendant and Espinoza to help find Lewis. The three went to defendant's apartment where Espinoza picked up a baseball bat while defendant obtained a large Bowie knife in addition to the survival knife he was already carrying. The three then set out together in Keenan's truck to encounter the eventualities of the night.

The three went to the home of Carolyn Rosel and James Russell. Espinoza and Keenan said they were looking for Lewis and wanted to kill him because he had "ripped" Michael[2] off." Defendant was carrying a knife in his hand and Espinoza was holding the baseball bat. The three then left the apartment and drove around looking for Lewis. Soon they spotted Anthony Klann walking along Mayfield Road. Keenan pulled his truck next to Klann and as Klann approached the vehicle, Keenan forced him into the back seat. The three men inquired as to the whereabouts of Lewis. Klann said he did not known where Lewis was but offered to take the three to Lewis's apartment. The four then drove to Lewis's apartment.

Upon reaching Lewis's apartment, Keenan and Espinoza went to look for Lewis while defendant held Klann in the truck at knifepoint. Two of Lewis's neighbors heard a commotion going on outside. Mimsel Dandec testified she heard someone yelling, "I want my dope" or "I want my coke." Dandec's roommate, Adam Flanik, proceeded to go downstairs and investigate. He saw Keenan and Espinoza kick down Lewis's apartment door and enter the apartment. He also saw Klann being held at knifepoint in the truck by defendant. It appeared to Flanik as though

Klann was crying and had been beaten. Lewis, however, was not to be found.

The three then returned to the Rosel/Russell home taking Klann along with them. Espinoza went to the door and asked whether Lewis had been there during the interim. Espinoza told Rosel that Klann was in the truck and "we're going to do him in, and drop him off." Russell testified Espinoza said Anthony was in the truck "and he's dead meat".

Espinoza returned to the truck and the three men who still held Klann captive drove away. Keenan drove his vehicle to the Doan Creek area off Martin Luther King Boulevard in Cleveland, Ohio. Both Keenan and Klann exited the truck. Defendant handed one of his knives to Keenan who again questioned Klann as to the whereabouts of Lewis. Klann, however, was either unwilling or unable to answer Keenan's questions.

Keenan told Klann to put his head back. When Klann complied, Keenan slashed Klann's throat with the knife and pushed him into the creek. Keenan then ordered defendant to "finish him off." Defendant grabbed his knife back from Keenan, chased after Klann who was running in the creek in spite of his throat being slashed and upon catching him, even though Klann begged for his life, repeatedly stabbed Klann in the chest and trunk leaving him for dead. The three men left Klann's body in Doan Creek and returned to defendant's apartment.

The next day Ronald Watson while out jogging, found Klann's body floating in the creek and telephoned police. Paul Lewis had returned home, found his apartment door kicked in and telephoned the police. The following Monday, Lewis was in a cafe on Mayfield Road. He overheard Adam Flanik and James Russell discussing a homicide and they believed the victim was Klann. The three men went to the morgue and after identifying the body, they talked with police. The police went to defendant's apartment. Espinoza, who lived with defendant, answered the door while defendant was in the bathroom. Espinoza voluntarily let the police enter the apartment. A baseball bat and two knives were found in plain view. Defendant and Espinoza were arrested. At trial, the coroner listed an incised wound of the neck and multiple stab wounds to the chest and trunk causing internal injuries and hemorrhaging as the cause of death.

Defendant's first assignment of error follows: "THE DEFENDANT WAS DEPRIVED OF HIS RIGHT TO A JURY TRIAL AS HIS WAIVER

OF A JURY TRIAL WAS NOT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY ENTERED."

Defendant's first assignment of error lacks merit.

Defendant contends his waiver of a jury trial was not given knowingly, voluntarily, and intelligently because the trial judge did not specifically explain the function of a jury trial in a capital case. Defendant admits waiving his right to a jury in writing, however, argues this is an insufficient waiver without a review of the differences between a jury trial and trial by a three-judge panel. Defendant's argument is unpersuasive.

On December 14, 1988, defendant executed and signed a waiver which stated as follows:

"I, Joe D'Ambrosio, the defendant in the above cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a judge of the court in which said cause may be pending. I fully understand that under the laws of this State, I have a constitutional right to a trial by jury."

/s/ Joe D'Ambrosio

At the beginning of defendant's trial, February 6, 1989, the following colloquy took place when the court inquired of defendant if he reaffirmed his decision to waive a jury:

"THE COURT: Let the record reflect we are here on case CR-232189 the State of Ohio versus Joseph D'Ambrosio. Mr. D'Ambrosio, on an earlier date you executed a waiver form that was incorporated and made part of the record. I take it you again discussed that with your attorneys?"

"THE DEFENDANT: Yes, I have."

"THE COURT: It is still your desire to go forward with a three judge panel as opposed to a jury.

"THE DEFENDANT: Yes, it is, your honor." (Tr. 4.)

This court has addressed a similar argument, holding as follows:

"In essence, defendant contends that the procedures set forth in Crim. R. 23(A) band R.C. 2945.05, and the questions asked by this trial judge, did not demonstrate a knowing, intelligent and voluntary waiver.

"A waiver of defendant's right to a jury trial that is signed by *defense counsel* and filed before trial is not effective, unless the record shows that the defendant was advised of his right to a jury trial, understood that right, and intelligently and voluntarily waived that right. *State* v. *Kehoe* (1978), 59 Ohio App. 2d 315, [13 O.O.3rd 328].

This court has held that a written waiver signed by the *defendant* prior to trial and followed by a one sentence inquiry by the trial judge is sufficient to insure defendant's rights. *State* v. *Johnson* (March 5, 1981), Cuyahoga App. No. 42722, unreported.

"While the trial court may pursue a detailed examination of the defendant to satisfy itself that the defendant is fully apprised by his right to a jury trial, such an extended interrogation is not required. The Criminal Rule and the Revised Code are satisfied by a writing signed by the defendant himself and filed with the court. Unlike some jurisdictions, Ohio does not require that the court personally inform the defendant of this right or make direct inquiry of the defendant as to the voluntariness of his waiver." (Emphasis in original.)

*State* v. *Morris* (1982), 8 Ohio App. 3d 12, 14 (footnotes omitted).

In the case *sub judice* defendant signed a written form which advised him that he had a constitutional right to a jury trial. At the time of the signing, defendant was represented by counsel. At the beginning of trial defendant was asked if he had *again* discussed a waiver with his counsel to which defendant replied affirmatively. The trial judge then specifically inquired whether defendant desired to be tried by a three-judge panel as opposed to a jury. Defendant again replied affirmatively. The trial court was under no obligation to explain the waiver issue in any more detail. There is nothing in the record to suggest defendant was confused, hurried or in any way misled. The record reveals defendant signed the jury waiver approximately a month and a half prior to trial, hence, defendant had ample time to discuss with his counsel, clarify any questions he may have had and mull over in his own mind the ramifications of a jury waiver. Defendant discussed the matter at least twice with his - counsel and was well aware he could opt for a jury trial. -Therefore, defendant knowingly, voluntarily, and intelligently waived his right to a jury trial.

Accordingly, defendant's first assignment of error is not -well taken and overruled.

Defendant's second assignment of error follows:

"THE DEFENDANT WAS DENIED A FAIR TRIAL WHEN HE WAS SUBJECTED TO AN ABUSIVE AND DISPARAGING COURSE OF CROSS-EXAMINATION.

Defendant's second assignment of error lacks merit.

Defendant contends he was denied a fair trial because of the prosecution's cross-examination of defendant. Specifically, defendant argues it was improper for the state to ask whether defendant was going to call an allegedly exculpatory witness to the stand. Defendant also complains it was improper for the state to ask defendant about the credibility of the state's witnesses. Finally defendant argues the prosecutor made improper remarks concerning defendant which made defendant appear to be a bad person. Defendant's arguments are unpersuasive.

Defendant's defense was based on a complete denial of the entire incident and that he was neither present nor knew anything concerning the murder. Defendant, during direct examination, testified both his girlfriend and Keenan's girlfriend could provide exculpatory testimony. The prosecutor, on crossexamination, inquired whether either one of these witnesses was going to testify. At the conclusion of defendant's testimony, the trial judge indicated he allowed such testimony only because neither one of the potential witnesses' names had been provided on the discovery list given to the state by the defense.

Evid. R. 611(B) provides as follows:

"(B) Scope of cross-examination. Cross examination shall be permitted on all relevant matters and matters affecting credibility."

In the case *sub judice*, defendant raised for the first time on direct examination the names of two exculpatory witnesses. The prosecution must then be allowed to determine if there is indeed exculpatory evidence and whether such evidence will be raised at trial. The prosecutor must be allowed to develop such testimony, not only to prevent unfair surprise testimony at trial, but also to determine if the prosecution itself should be continued. Had defendant simply provided the names before trial, the state could have made its own independent inquiry. Since the skate was not provided with the names of these individuals before trial, the prosecution was forced to develop the information at trial. Therefore, the trial judge correctly allowed the state to do so during cross-examination.

Defendant also complains he was unfairly cross-examined when he was asked if the state's witnesses were lying and if so, why they would lie against defendant. Ohio courts have stated, however, that such questioning may indeed be permissible, holding as follows:

"In our system of jurisprudence, wide latitude is allowed on cross-examination of a witness. Cross-examination is invaluable because it is a method of testing the accuracy, truthfulness and credibility of testimony. The limits to which a witness may be cross-examined rest in the sound discretion of the trial judge and this should not be interfered with unless the court abuses its - discretion to the prejudice of the party complaining." *State* v. *Huffman* (1912), 86 Ohio St. 229, 99 N.E. 295. *State* v. *Garfield* (1986), 34 Ohio App. 3d 300, 303.

In the case at bar, defendant's version of the events was inconsistent with that told by a variety of witnesses. Certainly it is relevant whether defendant knew any reason why any or all of these witnesses might be lying. The line of inquiry by the prosecutor gave defendant the opportunity to either explain away entirely or at least neutralize the damaging testimony of these witnesses. The questioning was neither excessive nor improper. Hence, the trial court did not abuse its discretion by allowing such testimony.

Finally, defendant objects to the following cross-examination:

"Q. A lot of people may have given you a lot of advise [sic], but I'm telling you now your best shot is to tell the truth.

"A. I am telling the truth, sir.

"Q. Well, let me tell you something, sir. You're lying, and nobody's going to believe it. And you're not smart enough to think of that.

"A. That's your opinion.

"Q. You think you can out smart everyone, don't you?"

"MR. DEFRANCO [defense counsel]. Objection.

"THE COURT. Objection is sustained. Place a question to him.

"Q. Tell the Court what you did after Anthony was murdered in the creek?

"A. I don't have any idea what you're talking about. - (Tr. 355.)

In the instant case, the prosecutor's remarks were directed to the credibility of defendant and when an objection was raised, the objection was sustained by the court. Defendant has shown no prejudice resulting from this comment in a complex trial. In the absence of any showing of a prejudicial effect, it may be inferred that the three-judge panel did not consider any remarks of either counsel to which a successful objection had been raised. When the trier of fact is a judge rather than a jury, the judge is given wide latitude in admitting or rejecting evidence and testimony. *Schmelzer* v. *Promotions for Industries, Inc.* (March 22, 1979), Cuy. Cty. App. No.

38636, unreported. A judge has more expertise than a jury in evaluating testimony. Therefore, error, if any, was harmless beyond a reasonable doubt and defendant was not deprived of a fair trial by any remarks made by the prosecutor during the cross-examination of defendant.

Accordingly, defendant's second assignment of error is not well taken and overruled.

Defendant's third assignment of error follows: "THE DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN-HE WAS CONVICTED OF AGGRAVATED MURDER AS [sic] THE EVIDENCE AS TO THE CAUSE OF DEATH CONSISTED OF POSSIBILITIES RATHER THAN PROBABILITIES."

Defendant's third assignment of error lacks merit.

Defendant contends there was insufficient evidence introduced concerning the cause of Klann's death. Specifically, defendant argues the coroner's testimony merely discussed possibilities and not probabilities. Therefore, defendant argues his due process rights were violated because he was convicted on insufficient evidence. Defendant's argument is unpersuasive.

In support of his argument, defendant refers to that portion of the coroner's testimony which discussed whether a specific knife caused a specific wound. The coroner did in fact testify as to the possibilities that a certain knife was used. However, when testifying as to defendant's cause of death, the coroner testified as follows:

"Q. Based on your background, experience and expertise in this area, and the fact that you performed this autopsy on Mr. Klann's body on September 25, 1988, do you have an opinion as to how Mr. Klann met his death?

"A. Yes, I do.

"Q. Would you give the manner and cause of death that Mr. Klann experienced?

"A. Mr. Anthony Klann came to his death as the result of stab wounds of the, trunk, which would mean the three stab wounds in the chest. An incised wound of the neck with multiple visceral injuries, which would include the injury to the trachea, and the lungs, and the liver, and the hemorrhaging. The manner of Mr. Klann's death is homicide." (Tr. 156.)

Clearly, the coroner testified as to the cause of death in no uncertain terms. Linking the defendant to the cause of death was done through the entirety of the state's case-in-chief. This included the testimony of the coroner, and other witnesses who saw defendant brandishing knives. The coroner's testimony concerning the knives merely confirmed that these knives, owned by defendant and seen in his possession that evening, could have been used to inflict the fatal wounds. The cause of death was clearly from an incised wound of the neck and multiple stab wounds to the chest and trunk causing multiple internal injuries with hemorrhaging.

Accordingly, defendant's third assignment of error is not well°taken and overruled.

Defendant's fourth assignment of error follows: "THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT OF ACCESS TO EVIDENCE WHEN HE WAS ILLEGALLY AND UNLAWFULLY ARRESTED AT HIS HOME AND THEREAFTER CONFINED IN JAIL WHERE HE COULD NOT OBTAIN INFORMATION WITH RESPECT TO LOCATING WITNESSES IN ORDER TO PRESENT A DEFENSE."

Defendant's fourth assignment of error lacks merit.

Defendant contends he was denied due process when he was denied access to evidence which could lead to exculpatory information. Defendant argues the evidence, to wit: "the name of defendant's girlfriend, was in the possession of police and not given to defendant.[3] Defendant's argument is unpersuasive.

"*** Due process guarantees fundamental fairness in the trial of a criminal defendant. *Lisenba* v. *California* (1941), 31 U.S. 219, 236. Although the guarantee of a fair trial does not mean an error-free or perfect trial, *United States* v. *Hasting* (1983), 461 U.S. 499, 508-509, due process does require the state to allow the accused to present a complete defense. *Trombetta, supra,* at 485.

"Generally, the state guarantees the accused the right to present a complete defense when it affords him access to evidence. Id., quoting *United States* v. *Valenzuela-Bernal* (1982), 458 U.S. 858, 867. The defense, however, does not enjoy an absolute right to all evidence which may be in the possession of the state. *United States* v. Agurs (1976), 427 U.S. 97. Rather, the right of a criminal defendant to have access to evidence extends only to that evidence which is material. *Brady, supra,* at 87.

"Whether evidence is material depends, to some extent, on the context in which a request for evidence is made. Where, for example, the defense seeks disclosure of evidence held by the state, the state must afford access to that evidence only where it is reasonably probable that

the evidence would undermine confidence in the outcome of the trial. *United States* v. *Bagley* (1985), 473 U.S. 667." *Columbus* v. *Forest* (1987), 36 Ohio App. 3d 169, 171.

In the case *sub judice*, defendant filed a motion for discovery listing eight specific types of information. This list did not include a request for the name of defendant's alleged girlfriend. At *no* time did defendant ever request this information. There is no indication in the record that defendant, his attorneys or his investigator were ever denied access to defendant's possessions. The fact the state may be in possession of exculpatory information when the exculpatory nature of such evidence is not known to the prosecutor does not amount to a violation of due process absent a request for such information pursuant to *Brady* v. *Maryland* (1963), 373 U.S. 83.

Accordingly, defendant's fourth assignment of error is not well taken and overruled.

Defendant's fifth assignment of error follows: "THE DEFENDANT WAS DENIED A FAIR TRIBUNAL AS THE PRESIDING JUDGE, JUDGE MICHAEL J. CORRIGAN, SHOULD HAVE EXCUSED HIMSELF FROM FURTHER PROCEEDINGS IN THIS CASE DUE TO THE FACT THAT HE HAD PRESIDED OVER A TRIAL OF A CO-DEFENDANT PRIOR TO THESE PROCEEDINGS AND ALSO ACCEPTED A PLEA FROM EDWARD ESPINOZA WHO WAS A WITNESS AGAINST THE DEFENDANT AND HE WAS TO BE SENTENCED BY THE COURT."

Defendant's fifth assignment of error lacks merit.

Defendant contends Judge Michael J. Corrigan should have recused himself from defendant's case *sub judice* since Judge corrigan presided during the jury trial of co-defendant Keenan and accepted a guilty plea from co-defendant Espinoza who testified against defendant. Defendant argues such behavior is inherently prejudicial and violative of Canon 3(C)(1)(a) of the Code of Judicial Ethics. Defendant's argument is unpersuasive.

Defendant raises this argument for the first time on appeal.

"An appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State* v. *Williams* (1977), 51 Ohio St. 2d 112, paragraph one of the syllabus, citations omitted.

In the case *sub judice*, since defendant proceeded through his entire trial without ever objecting to Judge Corrigan sitting as one of the three-judge panel trying his case, he cannot now complain. This court need not consider this error, if any, since defendant has waived it.

In addition, defendant has failed to demonstrate any prejudice. All three judges did in fact find defendant guilty.

Hence, defendant has provided this court with no indication that Judge Corrigan based his verdicts on evidence other than evidence presented at the trial of the case *sub judice* or that he, defendant, was prejudiced. The evidence presented in the trial of the case *sub judice* is sufficient to sustain a verdict of the three-judge panel. See discussions of assignments of error three, eight, nine and ten herein.

Accordingly, defendant's fifth assignment of error is not well taken and overruled.

Defendant's sixth assignment of error follows: "THE DEFENDANT WAS DENIED A FAIR TRIAL BY REASON OF IMPROPER ARGUMENT BY THE PROSECUTING ATTORNEY IN CLOSING ARGUMENTS."

Defendant's sixth assignment of error lacks merit.

Defendant contends the prosecutor made "improper remarks during closing arguments which prejudiced defendant. Defendant argues it was improper for the prosecutor to comment on the credibility of a witness. Defendant further argues the prosecutor improperly commented upon matters not introduced in evidence. Finally, defendant asserts it was improper for the prosecutor to comment on witnesses not introduced by defendant. Defendant's argument is unpersuasive.

Defendant first objects to the following portion of the prosecutor's closing argument:

"The case is so serious that I think it is necessary for the trier of fact to have that extra evidence that enables you to determine who the actual killers are. To that end we made a deal with Mr. Espinoza. Mainly because *we believe he's telling the truth*. At the outset when he was arrested he made the statements without entertaining any idea of remaining silent, without calling an attorney, without invoking any of his constitutional rights that would enable him to deprive the State or the police from any evidence that may be necessary to solve this case." (Tr. 379.)

Defendant argues it was improper for the prosecutor to vouch for the credibility of Espinoza.

The Ohio Supreme Court has held as follows: "The prosecution is normally entitled to a certain degree of latitude in its concluding remarks. *State* v. *Woodards* (1966), 6 Ohio St. 2d 14, 26 [35 O.O.2d 83, certiorari denied (1966), 385 U.S. 930; *State* v. *Liberatore* (1982), 69 Ohio St. 2d 583, 589 (23 O.O.3d 489). A prosecutor is at liberty to prosecute with earnestness and vigor, striking hard blows, but may not strike foul ones. *Berger* v. *United States* (1935), 295 -U.S. 78, 88. The prosecutor is a servant of the law whose interest in a prosecution is not merely to emerge victorious but to see that justice shall be done. It is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury. *United States* v. *Dorr* (C.A. 5, 1981), 636 F.2d 117.

"The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. *United States* v. *Dorr*, supra, at 120. To begin with, the prosecution must avoid insinuations and assertions which are calculated to mislead the jury. *Berger* v. *United States*, supra, at 88. It is improper for an attorney to express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused. *State* v. *Thayer* (1931), 124 Ohio St. 1; DR 7-106(C) (4) of the Code of Professional Responsibility. Moreover, the code provides that an attorney is not to allude to matters which will not be supported by admissible evidence, DR 7-106(C)(1), and '*** [a] lawyer- should not make unfair or derogatory personal reference to opposing counsel.***'" EC 7-37. *State* v. *Smith* (1984), 14 Ohio St. 3d 13.

In the case *sub judice* it must initially be pointed out that defendant failed to object to any of the allegedly improper remarks. Furthermore, since this case was tried not to a jury but to a three-judge panel, it greatly reduced the possibility of the trier of fact being influenced by improper remarks. *Schmeltzer, supra.*

The prosecutor's remark concerning the credibility of Espinoza amounted to a single statement, to-wit: "We believe he's telling the truth." This statement was given in an explanation by the prosecution concerning how and why Espinoza, a co-defendant, came to testify. The prosecutor was not necessarily expressing his opinion as to Espinoza's credibility as a witness *sub judice*, but rather his opinion as to the - credibility of Espinoza's statements given to police which led to the plea bargain arrangement. The statement within the explanation is a double edged sword cutting two ways:" *viz.*, 1) to credibility, vis-a-vis, truthfulness and 2) to credibility, vis-a-vis, prejudice since defendant gained through the plea bargain arrangement." Furthermore, error, if any, was not prejudicial but harmless beyond a reasonable doubt. The panel of three judges could evaluate this testimony 'and not be misled by a single prosecutorial remark concerning the credibility of one witness. This is especially true when one considers all the other factors brought out in regard to Espinoza's background, ~., poor military record, welfare system abuser, a co-defendant who plea bargained in exchange for his testimony, and an individual with an acute alcohol problem. The judges were clearly in a position to fairly judge Espinoza's credibility.

Defendant next objects to the following remarks of the prosecutor:

"The testimony of Carolyn Rosel and James Russell Lightfoot. Both of them have told this court that the three defendants came to their house the first time on that Saturday morning. And I'm convinced it's Saturday morning. I know there's an issue in this case, and we thought it over long and hard ever since the defense has raised it. We have gone over the statements given by all the witnesses at different times, at different places. And I'm still convinced that it's Saturday. To the point that even when the defendant here was arrested-he tried to provide an alibi for Saturday morning trying to claim that the last time he saw the victim alive was two o'clock Saturday morning. And that testimony came to you through Detective Allen. I don't know that it matters that much, but I do believe those five witnesses are correct that this incident occurred on Saturday morning. And on that Saturday morning at about three o'clock or 3:30. The three defendants did go to Mr. Lightfoot's house." (Tr. 380.)

Defendant contends the prosecutor was attempting to introduce evidence concerning an alibi. This simply is not the case. During trial, defendant, on multiple occasions, raised an issue of whether the murder had taken place at 2:00 a.m. on Friday *or* Saturday morning. Although defendant did not press the issue, choosing instead to merely identify the confusion, the issue had been raised. The prosecutor was simply

addressing the confusion by suggesting to the court that based on the facts *sub judice,* such confusion was irrelevant to deciding the case at bar. No comments were made concerning new matters.

Finally defendant complains about the following remarks made by the prosecutor during closing arguments:

"It's a little hard to believe that a man who had just had a serious argument with one or all three, whichever you choose to believe, in Coconut Joe's that night is going to flag this truck down and ask them for a ride home when he's not that far from his house. It's absurd to think, as the defendant has tried convince [sic] this Court, that they went out on the street looking for his girlfriend. All three of them. It took three men [sic] to look for his girlfriend? Being followed in the car by a young girl named Cindy who is Thomas Keenan's girlfriend.

"Now, so the Court understands, and this is part of the record, the State gave the name, full name of Cindy Calarry and address to all the defendants in this case. So if Mr. D'Ambrosio wished to call Cindy she is available. She was here down [sic] at the last trial, and they have her address. So he knows where she is, if he thinks that she can substantiate anything." (Tr. 383.)

Defendant argues this statement "exceeded all bounds of propriety and was done deliberately to confuse the on the important issue of self-defense." (Emphasis added.) This argument is ludicrous. First, defendant never raised the issue of self-defense. Defendant maintained throughout the entire trial he did not commit the murder and he was not present when the murder occurred. Second, there was no, this case was tried to a three-judge panel. In addition, there was nothing improper about these remarks. The prosecutor was merely critiquing defendant's testimony and providing the court with information that the prosecutor had 'complied with discovery. The relevance of such information should be abundantly clear to defendant since this statement negates a potential portion of the error claimed in defendant's second assignment of error. The Constitution entitles a criminal defendant to a fair trial, not a perfect one. *State v. Williams* (1988), 38 Ohio St. 3d 346, 348 (citations omitted.) Therefore, defendant was not denied a fair trial by any comments made by the prosecutor in closing arguments.

Accordingly, defendant's sixth assignment of error is not well taken and overruled.

Defendant's seventh assignment of error follows:

"THE DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN THE COURT RULED THAT HE WOULD BE VICARIOUSLY CRIMINALLY LIABLE FOR THE ACTS OF OTHERS REGARDLESS OF WHETHER HE POSSESSED THE REQUISITE CULPABLE MENTAL STATE."

Defendant's seventh assignment of error lacks merit.

Defendant contends the trial court erred in ruling defendant could be held liable as an aider and abettor regardless of whether he possessed a culpable mental state. Defendant further argues the court's "instructions"to the jury were, therefore, improper and unconstitutional.Defendant's argument is unpersuasive.

Initially it must again be noted the case *sub judice* was not tried before a jury. There were no jury instructionsgiven. The source of defendant's assignment of error was a statementby the court at trial during a discussion on the merits of defendant's Crim. R. 29 motion. The discussion in relevant part follows:

THE COURT: Do you want to address your attention then to the complicity evidence?

"MR. CASSIDY [defense counsel]: What evidence was there of the spoken word, or actions, other then being --he is placed at the scene on the night of the killing. But, there's nothing else to indicate --

"THE COURT: I'm not going to review the evidence, but the fact of the matter is the testimony, if believed, and that's not our function at this point, is that three individuals engaged in the course of criminal conduct, and did *purposefully* - one did one part, and one did the other part. And the theory of the State's case from the manner in which it's charged is that they were all responsible for the actions of the other, as if they had personally performed them." (Tr. 271.) (Emphasis added.) The court does not hold that defendant can be held strictly liable for the acts of others. The court even stated the acts were done *purposefully*. Therefore, since the court made no such ruling, no error was committed.

Accordingly, defendant's seventh assignment of error lacks merit and is overruled.

Defendant's eighth assignment of error follows:

"THE DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN HE WAS CONVICTED OF AGGRAVATED MURDER AS THERE WAS INSUFFICIENT EVIDENCE TO

SHOW PRIOR CALCULATION AND DESIGN WHICH WERE ELEMENTS OF AGGRAVATED MURDER."

Defendant's eighth assignment of error lacks merit.

Defendant contends the evidence introduced at trial was insufficient to convict him of aggravated murder. Specifically, defendant argues the state failed to prove the murder was committed with prior calculation and design. Defendant's argument lacks merit.

In *State* v. *Martin* (1983), 20 Ohio App. 3d 172, 175, the court stated as follows:

"As to the claim of insufficient evidence, the test is whether after viewing the probative evidence and inferences reasonably drawn there from in the light most favorable to the prosecution, any rational trier of 'fact could have found all the essential elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence." *Jackson* v. *Virginia* (1979), 443 U.S. 307, 319. [Citations omitted.)

In the case *sub judice*, defendant was found guilty of aggravated murder in count one of violating R.C. 2903.01(A) and in count two of violating R.C. 2903.01(B) set forth as follows:

"(A) No person shall purposely, and with *prior calculation and design*, cause the death of another. (Emphasis added.)

"(B) No person shall purposely cause the death of another while -committing or attempting to commit, or while fleeing immediately after committing or attempting to commit *kidnapping*, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape." (Emphasis added.)

There was evidence introduced which proves the murder was committed with prior calculation and design while committing a kidnapping. There was testimony by Adam Flanik that defendant was holding the victim at knifepoint in the back seat of Keenan's truck when Keenan and Espinoza kicked down the door of Lewis's apartment. Espinoza testified defendant had brought along two knives and handed one to Keenan which Keenan used to slash Klann's throat. Defendant then took the knife back from Keenan, and upon encouragement from Keenan chased down Klann in the creek. Finally, as Klann begged for his life, defendant stabbed him repeatedly in the chest and trunk.

When viewing the evidence in a light most favorable to the prosecution there is sufficient evidence that defendant participated in a kidnapping which led to the murder of Anthony Klann. There is also sufficient evidence defendant took affirmative steps in designing the murder. It was defendant who brought the knives that evening, held Klann at knifepoint during the course of events that transpired and grabbed the knife from Keenan to finish off Klann. It was also defendant who chased after and eventually caught an already injured Klann with the sole purpose of murdering him by inflicting the fatal wounds after Klann had begged for his life. Therefore, defendant was not convicted of aggravated murder based upon insufficient evidence proving prior calculation and design.

Accordingly, defendant's eighth assignment of error is not well taken and overruled.

Defendant's ninth assignment of error follows:

"THE DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN THE COURT CONVICTED THE DEFENDANT OF AGGRAVATED BURGLARY WHEN THE EVIDENCE SHOWS THE DEFENDANT COMMITTED NO ACT WHICH WOULD CONSTITUTE AN AGGRAVATED BURGLARY OTHER THAN BEING ALLEGEDLY PRESENT ON THE SCENE."

Defendant's ninth assignment of error lacks merit.

Defendant contends there was insufficient evidence adduced at trial which would support a conviction for aggravated burglary. Defendant argues the evidence merely showed he was present at the scene and this is insufficient to convict him as an aider and abettor. Therefore, defendant concludes the court should have granted his Crim. R. 29 motion for acquittal. Defendant's argument is unpersuasive.

"The standard for determining whether a motion for acquittal is properly denied is set forth in *State* v. *Bridgeman* (1978), 55 Ohio St. 2d 261, 9 0.0. 3d 401, N.E. 2d 184, syllabus, as follows:

"'Pursuant to Crim. R. 29(A), a court shall not order an entry of judgment of acquittal where the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.'

"A motion for judgment of acquittal under Crim. R. 29(A) should be granted only where reasonable minds could not fail to find reason-

able doubt. *State* v. *Bridgeman, supra; State* v. *Martin* (1985), 19 Ohio St. 3d 12, 13, 19 OBR 330, 337, 483 N.E. 2d 1157, 1165." *State* v. *Apanovitch* (1987), 33 Ohio St. 3d 19, 23.

"Under R.C. 2923.03, a person may be an accomplice in an offense and prosecuted as the principal offender if, among other things, he aids or abets another in committing the offense while acting with the kind of culpability required for commission of the offense." *State* v. *Coleman* (1988), 37 Ohio St. 3d 286, paragraph two of the syllabus.

In the case *sub judice*, defendant was convicted of violating R.C. 2911.11, aggravated burglary, which provides in relevant part as follows:

"(A) No person, by force, stealth, or deception, shall trespass in an occupied structure, as defined in section 2909.01 of the Revised Code, or in a separately secured or separately occupied portion thereof, with purpose to commit therein any theft offense, as defined in section 2913.01 of the Revised Code, or any felony, when any of the following apply:

"(1) The offender inflicts, or attempts or threatens to inflict physical harm on another.

"(2) The offender has a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code, on or about his person or under his control.

"(3) The occupied structure involved is the permanent or temporary habitation of any person, in which at the time any person is present or likely to be present."

The evidence introduced at trial clearly shows defendant's participation in the aggravated burglary was greater than merely being an observer. Defendant's role in the burglary was (1) to help force Klann to divulge the location of Lewis's apartment, and (2) to hold Klann captive in the truck which allowed Keenan and Espinoza to break into the apartment without worrying that Klann would run away to seek help or that anything might happen to the truck to thwart their getaway. It is certainly reasonable to infer defendant knew the group was going to Lewis's apartment and would *trespass by force with intent to inflict harm* upon Lewis. R.C. 2911.11(A) (1). In fact, when Keenan, Espinoza and defendant entered Carolyn Rosel's house looking for Lewis, she testified Espinoza had a bat, defendant had a "big knife" in his hand and she further testified "they said they wanted to kill him [Lewis], that he had ripped Michael off." When they kicked in

Lewis's door *they were actually hoping Lewis was in his apartment.* R.C. 2911.11(A) (3). Defendant had the same culpability as Keenan and Espinoza, therefore, as an aider and abettor, there was sufficient evidence to find defendant guilty of aggravated burglary.

Accordingly, defendant's ninth assignment of error is not well taken and overruled.

Defendant's tenth assignment of error follows:
"THE DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN HE WAS CONVICTED OF KIDNAPPING AS THERE WAS A FAILURE TO SHOW THE PURPOSE REQUIRED IN THE KIDNAPPING INDICTMENT."

Defendant's tenth assignment of error lacks merit.

Defendant contends there was insufficient evidence presented at trial to convict him of kidnapping. Defendant contends there was no evidence that his purpose in restraining Klann's liberty was to use Klann as a shield or hostage.

Defendant's argument is unpersuasive.

Count three of the indictment stated in relevant part as follows:

"[Defendant] unlawfully and purposely and by force, threat or deception removed Anthony Klann from the place where he was found or restrained him of his liberty for the purpose of using him as a shield or hostage *and or terrorizing, or inflicting serious physical harm* on Anthony Klann and failed to release the victim in a safe place unharmed." (Emphasis added.)

This indictment is consistent with R.C. 2905.01, kidnapping, which provides in relevant part as follows:

"(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where he is found or restrain him of his liberty, for *any* of the following purposes:

"(1) To hold for ransom, or as a shield or hostage;

"(2) To facilitate the commission of any felony or flight thereafter;

"(3) To terrorize, or to inflict serious physical harm on the victim or another." (Emphasis added.)

Defendant's argument is specious. There is no requirement for the state to prove defendant's purpose was to use Klann as a shield. Rather, the state had to prove defendant's purpose was *either* to use Klann as a shield, and/or to terrorize or inflict serious physical harm on Klann. The state met the second part of this test, therefore, the

state had proved defendant's "purpose" beyond a reasonable doubt, viz., defendant (along with Keenan and Espinoza) kidnapped or restrained Klann of his liberty to either terrorize and/or beat Klann into revealing the whereabouts of Lewis. This was obviously the group's purpose *at the time Klann was forced into the truck*. Flanik's testimony revealed defendant held Klann in the truck at knifepoint, while Espinoza and Keenan kicked down Lewis's apartment door, and it appeared Klann was crying and had been beaten. There is no argument they failed to release Klann in a safe place unharmed. Hence, there was sufficient evidence presented at trial to find defendant guilty as charged in count three of the indictment.

Accordingly, defendant's tenth assignment of error is not well taken and overruled.

Defendant's eleventh assignment of error follows:

"THE DEFENDANT WAS DENIED DUE PROCESS OF LAW AND SUBJECTED TO A CRUEL AND UNUSUAL PUNISHMENT WHEN HE WAS CONVICTED UNDER A DUPLICITOUS INDICTMENT AND THE VERDICT OF THE COURT DID NOT IDENTIFY ANY BASIS OF A CONVICTION OTHER THAN THE REPEATING OF THE INDICTMENT THUS PRECLUDING AN INDIVIDUALIZED CONSIDERATION OF THE OFFENSE AND MITIGATING AND AGGRAVATING CIRCUMSTANCES."

Defendant's eleventh assignment of error lacks merit.

Defendant contends the indictments were vague because defendant was charged with alternative elements of the crimes. Defendant further contends the verdict of the three-judge panel is also vague because it repeats the allegations of the indictment. Defendant argues he is thus precluded from any individualized meaningful review of his case. Defendant's argument is unpersuasive.

In the case *sub judice*, defendant was charged on four distinct counts as follows:

*"Count One*

unlawfully and purposely and with prior calculation and design, caused the death of another, to-wit Anthony Klann.

*"SPECIFICATION* 1: (Felony Murder)

The Grand Jurors further find and specify that the offense presented above was committed while the offenders were committing or attempting to commit or fleeing immediately after committing or attempting to commit Kidnapping and either the offenders were the principal offenders in the commission of the Aggravated Murder or, if not the principal offenders, committed the Aggravated murder with prior calculation and design.

*"Count Two*

unlawfully and purposely caused the death of another, to-wit: Anthony Klann while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit Kidnapping.

*"SPECIFICATION* 1: (Felony Murder)

The Grand Jurors further find and specify that the offense presented above was committed while the offenders were committing or attempting to commit or fleeing immediately after committing or attempting to commit Kidnapping and either the offenders were the principal offenders or if not the principal offenders, committed the Aggravated Murder with prior calculation and design.

*"Count Three*

unlawfully and purposely and by force, threat or deception removed Anthony Klann from the place where he was found or restrained him of his liberty for the purpose of using him as a shield or hostage and or terrorizing, or inflicting serious physical harm on Anthony Klann and failed to release the victim in a safe place unharmed.

*"Court Four*

unlawfully and purposely and by force, stealth, or deception trespassed in an occupied structure as defined in Section 2909.01 of the Revised Code, or in a separately secured or separately occupied portion thereof, the property of Paul Lewis, with the purpose to commit therein a theft offense as defined in Section 2913.01 of the Revised Code, or a felony, while having a deadly weapon or dangerous ordnance, to-wit: knives, as defined in Section 2923.11 of the Revised Code on or about their persons or under their control and/or by force, stealth, or deception trespassed in an occupied structure as defined in Section 2909.01 of the Revised Code, or in a separately secured or separately occupied portion thereof, with the purpose to commit therein a theft offense as defined in Section 2913.01 of the Revised Code, or a felony, and the occupied structure involved is the permanent or temporary habitation of Paul Lewis, in which at the time any person was present or likely to be present."

The prosecution was required to prove four separate counts beyond a reasonable doubt:

simply stated to-wit; 1) murder with prior calculation and design with specification; 2) murder while committing kidnapping with specification; 3) kidnapping; and 4) aggravated burglary. The elements of each crime are set forth in the indictment. The three-judge panel unanimously found defendant guilty on all four counts.

Crim. R. 23(C) states in full:

"In a case tried without a jury the court shall make a general finding.

"The record reveals the case *sub judice* was tried without a jury because appellant made a knowing, intelligent and voluntary waiver of her right to a jury trial. The general verdict rendered by the trial court was in keeping with the express directive of Crim. R. 23(C)." *State* v. *Walker* (1985), 26 Ohio App. 3d 29, 31.

The panel, therefore, was not required to state specific findings in their verdict. That does not prevent this court from a meaningful review of the case at bar. Indeed, defendant has assigned nineteen separate errors which this court must address. We have the trial court record and transcript to aid our review.

Concerning defendant's argument that counts one and two are duplicitous, we find such an argument to be misleading. Defendant, along with Keenan and Espinoza, was charged with murder under two separate theories. The General Assembly created the classifications for aggravated murder. Therefore, it was not unconstitutional to indict defendant on both counts. See *State* v. *Royster* (1982), 3 Ohio App. 3d 444. See also defendant's fourteenth assignment of error, *infra* for a more complete discussion of this issue.

Accordingly, defendant's eleventh assignment of error is not well taken and overruled.

Defendant's twelfth assignment of error follows:

"THE DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN HE WAS CONVICTED AND SENTENCED BOTH AS A PRINCIPAL OFFENDER AND AS AN AIDER AND ABETTOR UNDER THE FINDINGS BY THE COURT."

Defendant's twelfth assignment of error lacks merit.

Defendant contends he was denied due process of law because he was convicted and sentenced as both a principal and as an aider and abettor. Defendant argues this was error since different culpable states are required under each theory. Defendant's argument is unpersuasive.

The facts of the case *sub judice* support either or both theories of murder. The facts are so intricately intertwined one would be hard pressed to segregate the theories based upon the facts contained in the evidence. These theories are based upon the following facts:

"1) Defendant brought two knives when he, Keenan, and Espinoza went to defendant's apartment and Espinoza obtained a baseball bat.

"2) Defendant held Klann, the victim, at knifepoint throughout the entire night while the three men drove around the area;

a) stopping at the Rosel/Russell house;

b) then driving to Lewis's apartment breaking down the door;

c) and returning to the Rosel/Russell house;

all to determine the whereabouts of Lewis so they could kill him.

"3) Defendant drove with the other two men still holding Klann at knifepoint to Doan Creek.

"4) Defendant handed Keenan one of his knives after which Keenan slashed Klann's throat.

"5) Defendant upon command to finish off Klann grabbed the knife from Keenan.

"6) Defendant set off after Klann and chased him in the creek.

"7) Defendant listened to Klann beg for his life.

"8) Defendant personally stabbed Klann repeatedly, inflicting the three fatal wounds in Klann's chest and trunk, in spite of Klann's plaintive pleas for mercy."

In the case *sub judice*, R.C. 2929.04(A) (7) allows the death penalty to be imposed for aggravated murder with an underlying felony of kidnapping only when the defendant "was [1] the principal offender in the commission of the aggravated murder or, if not the principal offender, [2] committed the aggravated murder with prior calculation and design" based upon his culpable mental state.

The evidence in the case *sub judice* supports either theory presented in the indictment:" *i.e.,* 1) all three acted in concert with each other to carry out the events of the evening; or 2) each aided and abetted the other in the commission of each crime."

Defendant cites *State* v. *Penix* (1987), 32 Ohio St. 3d 369 to support his argument that a death sentence may not be based on alternative aggravating circumstances. The *Penix* court upheld the reversal of a death sentence because the *instructions given to the Jury* during the penalty phase of trial were confusing since the court included

portions of the indictment not relevant to the defendant's crime. In the case at bar, defendant's reliance on *Penix* is, however, misplaced. *Penix* involved a confusing instruction to a jury. *Penix* also involved a defendant convicted under only *one count* of aggravated murder. Finally, Penix involved the *Penalty* phase of the trial not the guilt portion. The concerns expressed by the *Penix* court are not present in the case *sub judice*. Since defendant was found guilty under both counts one and two of the indictment the possibility defendant was convicted by the trier of facts under *different* theories is not present. Rather, defendant was convicted under *both* theories supported by the evidence. There is also no concern about jury confusion *sub judice* since the case was tried to a three-judge panel. Therefore, defendant was not deprived of due process of law.

Accordingly, defendant's twelfth assignment of error is not well taken and overruled.

Defendant's thirteenth assignment of error follows:

"THE DEFENDANT WAS DENIED DUE PROCESS OF LAW AND SUBJECTED TO A CRUEL AND UNUSUAL PUNISHMENT WHEN THE SENTENCING COURT DID NOT PROPERLY CONSIDER NOR IDENTIFY WHY THE ALLEGED AGGRAVATING CIRCUM-STANCES OUTWEIGHED THE MITIGATING CIRCUMSTANCES WITH EVIDENCE BE-YOND A REASONABLE DOUBT."

Defendant's thirteenth assignment of error lacks merit.

Defendant contends the trial court erred in not Specifically identifying the factors considered in that the determining aggravated circumstances of the murder outweighed the mitigating factors. Defendant's argument is unpersuasive.

The Ohio Supreme Court has held as follows:

"R.C. 2929.03(F) sets forth the duties of a three judge panel in imposing the death sentence.

"In relevant part, that statute provides:

'The *** panel of three judges, when it impos-es the sentence of death *shall* state in a separate opinion its specific findings as to the existence of any mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the exis-tence of any other mitigating factors, the aggra-vating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors. ***" (Emphasis

added.) See, also, *State* v. *Maurer, supra,* at paragraph three of the syllabus.

'On appeal, a reviewing court must determine the appropriateness of imposing a death sentence by considering whether the sentence is excessive as well as, after independently weighing the evidence, whether the aggravating circumstances outweigh beyond a reasonable doubt the mitigat-ing factors presented by the defendant. R.C. 2929.05(A). A concomitant aspect of that review is a determination as to whether the sentencing court properly weighed the mitigating factors against the aggravating circumstances.' *State* v. *Maurer, supra,* at 246, 15 OBR at 385, 473 N.E. 2d at 777." *State* v. *Johnston* (1988), 39 Ohio St. 3d 48, 57.

In the case *sub judice* the opinion of, the trial judges made pursuant to R.C. 2929.03(F) provid-ed in relevant part as follows:

"The panel considered all the Mitigating Factors set forth in O.R.C. 2929.04(B), the exis-tence of any other mitigating factors, the Aggra-vating Circumstance of which the defendant was found guilty, as well as all the evidence adduced at trial.

"At the mitigation stage of the trial, the panel was presented with defendant's mitigation exhibit one, a presentence investigation report; D-M-2(A) and (B), a report and addendum report from the Court' Psychiatric Clinic, D-M-3, the defendant's military record; and D-M-4, the defendant's high school record. The presentence report and the reports from the Psychiatric Clinic are devoid of any evidence mitigating the Aggra-vated Murder of Anthony Klann. The military record speaks for itself, however, its significance is diminished when read together with D-M-2 page 2 which states:

"'He admitted to excessive consumption while he was in the United States Army with occasion-al blackouts."..."He described a binge pattern of drinking ... where he would drink heavily for a week and then abstain for two to three weeks ...

"D-M-4, the defendant's high school record, is self explanatory. The panel did discuss the grade point average (1.441), the subjects taken, and the excessive absenteeism and tardiness (78 days absent, 49 days tardy).

The defendant presented a series of 'mitiga-tion' witnesses.

"Dan Bick testified he was a good friend of the defendant. He stated that the defendant was a good citizen, non-violent and likeable. He stated that the defendant could be rehabilitated.

"Peggy DeCarlo testified that she has known the defendant for ten years and her son, Ron Pelenko, was his best friend. She stated he was respectful and had a good attitude toward authority figures. She stated he was non-violent and described a situation where he walked away from a confrontation at a picnic.

"Dick Powell, a co-worker in 1986 at a Gulf station, testified that Joe was polite, respectful and truthful. He feels Joe can be rehabilitated.

"Margo Allen testified that her son went into the Air Force due to the defendant's influence on him. She stated he was non-violent, cheery, respectful, hardworking, and amenable to rehabilitation.

"Dorothy (D'Ambrosio), the defendant's mother, discussed the impact of the defendant's father's death and the relationship they shared. She discussed the family life of the defendant. She stated that her son was a good boy, helpful to others and peaceful. She shared a story about a little bird and discussed her pride relative to his service in the army. She stated he could be rehabilitated and live a useful life.

"The defendant made an unsworn statement and outlined his life, military career, job situations and his limited involvement with the law. The defendant stated that the death of Anthony Klann was tragic, but he had nothing to do with it.

"Based on all of the information presented, the panel found beyond reasonable doubt that the aggravating circumstances of which the defendant was found guilty clearly outweigh the mitigating evidence.

"The panel considered as a matter of law any relevant mitigating factors and has applied the type of individualized consideration of Mitigating Factors as required by the Eighth and Fourteenth Amendments in a capital case. *Eddings* v. *Oklahoma* (1982), 455 U.S. 104, 71 L.Ed.2d 1; *Lockett* v. *Ohio* (1978), 428 U.S. 586; and *State* v. *Williams* (1986), 23 Ohio St. 3d 16.

"Based upon all the foregoing, the court sentenced the defendant, Joe D'Ambrosio to death. This pronouncement was made February 23, 1989."

The aggravating circumstances were listed in the indictment and proved at trial.

"Under R.C. 2929.03(F), a trial court or three-judge panel may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State* v. *Stompf* (1987), 32 Ohio St. 3d 95, paragraph one of the syllabus.

After listing all the mitigating factors and citing the aggravating circumstances that had been determined by the evidence, the court did not identify the reasons the aggravating circumstances outweighed the mitigating factors. However, defendant has failed to demonstrate this was prejudicial.

This case is similar to *Johnston, supra,* which held as follows:

"Here, the trial court found that the aggravating circumstances of the crimes appellee was found guilty of committing outweighed the evidence of any of the mitigating factors presented by appellee. However, the trial court failed to specify either what evidence it found to be mitigating or its rationale for stating that such evidence did not outweigh the aggravating circumstances. In failing to fully comply with R.C. 2929.03(F), the trial court erred. Nevertheless, appellee has not shown that he was prejudiced by this error in any way. This is simply not the "closer case" referred to in *Maurer.* Thus we conclude that, under the circumstances of this case, the court of appeals erred in holding that appellee had been prejudiced by the trial court's failure to comply with R.C. 2929.03(F)" *Johnston, supra,* at 57. (Footnotes omitted.) An independent review of the facts shows this was a heinous crime. Anthony Klann, an eighteen year old, was brutally murdered without provocation because he was an acquaintance of Paul Lewis who could not be found. Defendant, who was twenty-eight years old at the time of the murder, denied committing the crime and showed little remorse. The three-judge panel clearly considered all factors required. Although it may have been error not to finally state the reasons for its conclusions, error, if any, was not prejudicial and, therefore, harmless beyond a reasonable doubt. This court, the Eighth District Court of Appeals was not denied the opportunity to afford defendant a meaningful appellate review in the case *sub judice.*

Accordingly, defendant's thirteenth assignment of error is not well taken and overruled.

Defendant's fourteenth assignment of error follows:
"THE DEFENDANT WAS SUBJECTED TO A CRUEL AND UNUSUAL PUNISHMENT WHEN THE COURT FAILED TO MERGE THE TWO DEATH SENTENCES FOR CONVICTIONS OF AGGRAVATED MURDER AND SEPARATELY SENTENCED THE DE-

FENDANT ON THE KIDNAPPING CONVICTION WHICH SHOULD BE MERGED WITHIN THE AGGRAVATED MURDER CHARGE."

Defendant's fourteenth assignment of error lacks merit.

Defendant contends the trial court erred in sentencing. Defendant argues the count of kidnapping should have been merged with the second count of aggravated murder. Defendant further argues the two counts of aggravated murder should have been merged. Defendant's arguments are unpersuasive.

Ohio courts have previously determined a defendant may be convicted for felony murder and the underlying felony. *State* v. *Moss* (1982), 69 Ohio St. 2d 515; *Royster, supra.*

R.C. 2941.25(A) provides as follows:

"Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."

In *State* v. *Blankenship* (1988), 38 Ohio St. 3d - 116, the Supreme Court established a two-tiered test to determine whether two crimes with which a defendant is charged are allied offenses of similar import under R.C. 2941.25(A). The Blankenship court set forth the following test:

"In the first step, the elements of the two crimes are compared. If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must then proceed to the second step. In the second step, the defendant's *conduct* is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses. *State* v. *Mughni* (1987), 33 Ohio St. 3d 65. 67, 514 N.E. 2d 870, 872; *State* v. *Talley* (1985), 18 Ohio St. 3d 152, 153-154, 18 OBR 210, 211- 212, 480 N.E. 2d 439, 441; *State* v. *Mitchell* (1983), 6 Ohio St. 3d 416, 6 OBR 463, 464, 453 N.E.2d 593, 594; *State* v. *Logan* (1979), 60 Ohio St. 2d 126, 128, 14 O.O. 3d 373, 374, 397 N.E. 2d 1345, 1348." (Emphasis in original.) *Blankenship, supra,* at 117.

In the case *sub judice,* the commission of murder during a kidnapping will obviously also result in a kidnapping. Therefore, step two of the *Blankenship* test must be addressed. The kidnapping was completed with a separate animus, *viz.,*

to determine the whereabouts of Lewis, long before the murder was perpetrated. Since the crimes were committed separately and with a separate animus, defendant was properly convicted of both kidnapping and felony murder. *See e.g., State* v. *Logan* (1979), 60 Ohio St. 2d 126; *State* v. *Henry* (1987), 37 Ohio App. 3d 3.

In regard to defendant's contention the two aggravated murder charges should have been merged, defendant has misstated the court's sentence. Defendant may not be *convicted* of aggravated murder twice for a single killing. *State* v. *Huertas* (1990), 51 Ohio St. 3d 22, 28. A conviction is that legal proceeding which ascertains the guilt of the party upon which the sentence or judgment is founded. *State, ex rel. Lipschutz,* v. *Shoemaker* (1990), 49 Ohio St. 3d 88,89. Simply stated, a *conviction* requires a two-step process: *"viz.,* 1) a finding of guilt and 2) the subsequent sentencing of defendant." Although defendant was found guilty of aggravated murder on two counts, the court issued only one order of execution and merged both counts one and two of the indictment in the one sentence. *State* v. *Poindexter* (1988), 36 Ohio St. 3d 1. Therefore, defendant was *convicted* of only one count of aggravated murder, hence, the court did not err in sentencing defendant.

Accordingly, defendant's fourteenth assignment of error is not well taken and overruled.

Defendant's fifteenth assignment of error follows:

"THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHTS WHEN THE LAW PERMITS AN AGGRAVATING CIRCUMSTANCE WHICH CONSISTS OF AN ATTEMPT TO BE ELEVATED INTO A CIRCUMSTANCE THAT WILL PERMIT THE IMPOSITION OF A DEATH PENALTY."

Defendant's fifteenth assignment of error lacks merit.

Defendant contends the death penalty may not be imposed based on an aggravating circumstance which was only an attempt. Defendant argues the two counts of aggravated murder contained a specification for attempted kidnapping. Defendant's argument is unpersuasive

While it is true the specification did include the phrase attempting to commit, it is not true that this implicitly means defendant was found to have attempted a kidnapping. The indictment read *"committing* or attempting to commit" a kidnapping. The evidence supports defendant's guilt of actually *committing* a kidnapping in count three. Therefore, it is clear defendant was

not found guilty of an aggravating circumstance which amounted to only an attempt.

"Accordingly, defendant's fifteenth assignment of error is not well taken and overruled.

Defendant's sixteenth assignment of error follows:

"THE DEFENDANT WAS SUBJECTED TO CRUEL AND UNUSUAL PUNISHMENT BECAUSE THE UNDERLYING FELONIES ARE IMPERMISIVELY [sic] ENHANCED SO AS TO AUTHORIZE THE IMPOSITION OF A DEATH PENALTY WHEN EITHER SINGULARLY OR CUMULATIVELY SUCH PUNISHMENT IS PROHIBITED."

Defendant's sixteenth assignment of error lacks merit.

Defendant contends it is unconstitutional to convict him of kidnapping and then use the kidnapping as an aggravating circumstance to impose the death penalty. Defendant argues since the legislature determined kidnapping is punishable by ten to twenty-five years in jail, the legislature may not also punish defendant for kidnapping by allowing the kidnapping to be used as an authorization to impose the death penalty. Defendant's argument is unpersuasive.

A similar argument was made in *State v. Barnes* (1986), 25 Ohio St. 3d 203, 206. The *Barnes* court held in relevant part as follows:

"The elements of the aggravating circumstances of aggravated burglary and aggravated robbery do not merely duplicate the elements of the underlying crime of aggravated murder. The function of an aggravating circumstance, as noted by the United States Supreme Court, in *Zant* v. *Stephens, supra,* at 877, is:

"*** [To] genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." "R.C. 2929.04(A)(7), which sets forth the aggravated burglary and aggravated robbery aggravating circumstances, accomplishes that function by allowing the death penalty to be imposed for those felony murders only when the defendant was the principal offender or when the murder was premeditated. Thus, both the robbery and burglary aggravating circumstances require an additional fact, independent of the elements of aggravated murder, be proven before an offender is eligible for capital punishment. The trial court had to find that appellant committed murder while committing or attempting to commit burglary and/or robbery and, further, that appellant was the principal

offender or that the murder was premeditated. An accomplice could be convicted of aggravated murder but would not be subject to the death penalty. By such a limitation, the category of death-eligible aggravated murderers is narrowed in compliance with *Zant* and no constitutional violation arises." *Barnes, supra.*

In the case *sub judice,* R.C. 2929.04(A)(7) allows the death penalty to be imposed for aggravated murder with an underlying felony of kidnapping only when the defendant "was [1] the principal offender in the commission of the aggravated murder or, if not the principal offender, [2] committed the aggravated murder with prior calculation and design." In the case *sub judice,* the evidence supports both findings:" *i.e.,* 1) defendant was the principal offender who committed the murder during the commission of a kidnapping, and 2) also committed the murder with prior calculation and design. Therefore, there is no constitutional violation since kidnapping narrows the class of persons eligible for the death penalty.

Accordingly, defendant's sixteenth assignment of error is not well taken and overruled.

Defendant's seventeenth assignment of error follows:

"THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHTS WHEN HIS SENTENCE WAS INCREASED TO ACTUAL INCARCERATION AFTER SENTENCE HAD BEEN ORALLY PRONOUNCED BY THE COURT."

Defendant's seventeenth assignment of error lacks merit.

Defendant contends the trial court erred in sentencing -defendant on the aggravated burglary and kidnapping charges. Defendant argues the court orally sentenced defendant for a term of ten to twenty-five years, but in the court's written journal, defendant was sentenced to ten years *actual* incarceration. Defendant thus argues the court's change in sentencing violated Crim. R. 43, which requires defendant be present for sentencing. Defendant's argument is unpersuasive.

R.C. 2929.11(B)(1)(a) provides as follows:

"(1)For an aggravated felony of the first degree:

'(a) If the offender has not previously been convicted of or pleaded guilty to any Aggravated felony of the first, second, or third degree aggravated murder or murder, or any offense set forth in any existing or former law of this state, any other state, or the United States that is substan-

tially equivalent to any aggravated felony of the first, second, or third degree or to aggravated murder or murder, the minimum term, which may be imposed as a term of *actual incarceration*, shall be five, six, seven, eight, nine, or ten years, and the maximum term shall be twenty-five years;'" (Emphasis added.)

Defendant was found guilty of kidnapping and aggravated burglary, both felonies of the first degree. In the case *sub judice*, the trial court had no discretion whether defendant's sentence would involve actual incarceration. The only discretion involved the minimum number of years. There is no dispute defendant was sentenced to a minimum term of ten years. To contend defendant's sentence was changed is merely an argument of semantics. Defendant was present when sentenced; hence, there was no violation of Crim. R. 43.

Accordingly, defendant's seventeenth assignment of error is not well taken and overruled.

Defendant's eighteenth assignment of error follows:

"THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL."

Defendant's eighteenth assignment of error lacks merit.

Defendant contends there were a number of omissions and errors committed by counsel which demonstrate defendant was denied the effective assistance of counsel. Defendant's arguments are unpersuasive and will be addressed individually.

The Ohio Supreme Court has enunciated the standard for evaluating this argument as follows:

"Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (*State* v. *Lytle* [1976], 48 Ohio St. 2d 391, 2 O.O. 3d 495, 348 N.E.2d 623; *Strickland* v. *Washington* [1984], 466 U.S. 668, followed.)

"To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State* v. *Bradley* (1989), 42 Ohio St. 3d 136, paragraphs two and three of the syllabus.

Defendant first argues there is no record defendant's counsel explained the function of a jury in a capital case to defendant. Thus, defendant contends it was not possible to provide a meaningful waiver of his right to a jury trial. This argument was addressed in defendant's first assignment of error. Defendant has introduced no evidence counsel did not discuss the jury waiver issue with defendant. Rather, defendant admitted to the court that he had discussed his jury waiver with his attorneys. Defendant has also offered no showing of any prejudice which resulted from his jury waiver. Therefore, this argument is without merit.

Defendant next argues his counsel was ineffective for withdrawing a motion to suppress evidence discovered by the police incident to defendant's arrest. Defendant argues since his arrest was warrantless and in his home, it was illegal.

Hence, defendant contends any evidence resulting from the arrest should have been suppressed.

Defendant's counsel had filed a motion to suppress but withdrew it at the beginning of trial as follows:

"MR. DEFRANCO: We can withdraw the motion. We are satisfied from the discovery.

"THE COURT: I don't know that this is going to be the same evidence that came out of the first trial, but there was evidence I believe that was incident to a lawful arrest. And Mr. Espinoza and Mr. D'Ambrosio was [sic] in fact arrested. And the various items were seized to include three knives that were seized in the residence of Mr. D'Ambrosio.

"If you want to withdraw that, that's your decision, is it not?

"MR. DEFRANCO: We've had a thorough opportunity to review the matter with Mr. Marino [prosecutor], and we've become totally familiar with the trial, and I think on the basis of what we know of the circumstances we could withdraw the motion and proceed with the trial.

"THE COURT: All right. The motion to suppress will be withdrawn." (Tr. 11).

In the case *sub judice*, the police officers who were investigating the case were voluntarily permitted to enter the apartment by Espinoza who lived with defendant. Once inside, the knives and baseball bat were in plain view.

"A warrantless arrest in a suspect's home may be valid if necessitated by exigent circumstances or performed in "good faith" compliance with standards of conduct which, at the time of the arrest, were permissible." *State* v. *Williams* (1983), 6 Ohio St. 3d 281.

In the case at bar, the police were acting in good faith since they were investigating the murder of Anthony Klann. Upon entrance into

defendant's apartment, the police saw the potential murder weapons laying out in plain view, therefore, they had probable cause to make an arrest. Since the arrest was valid, defendant's motion to suppress would have been denied. Hence, defendant's counsel was not ineffective for withdrawing his motion to suppress. See, *State* v. *Gibson* (1980), 69 Ohio App. 2d 91.

Defendant further argues defendant's counsel was ineffective because no effort was made to disqualify the presiding judge. This argument was addressed in defendant's fourth assignment of error. Defendant has neither introduced evidence of any prejudice from this alleged error, nor has he shown this to be error. He merely states his proposition. Therefore, defendant has not proved ineffective assistance of counsel.

Defendant next argues his counsel was ineffective because he allowed psychiatric reports to be prepared and some of the information contained in the reports proved harmful to defendant.

R.C. 2929.03(D)(1) provides in pertinent part as follows:

"When death may be imposed as a penalty, the court, upon the request of the defendant, shall require a pre-sentence investigation to be made and, upon the request of the defendant, shall require a mental examination to be made, and shall require reports of the investigation and of any mental examination submitted to the court, pursuant to section 2947.06 of the Revised Code. No statement made or information provided by a defendant in a mental examination or proceeding conducted pursuant to this division shall be disclosed to any person, except as provided in this division, or be used in evidence against the defendant on the issue of guilty in any retrial. A pre-sentence investigation or mental examination shall not be made except upon request of the defendant."

Defendant's attorneys requested the psychiatric examination be performed in an attempt to develop possible mitigation evidence. This was a tactical decision made by counsel. Although it is true the panel found no mitigating factors, neither did they find any prejudicial factors. Defendant alleged the court relied on information in the psychiatric report stating defendant had excessive alcohol consumption which resulted in blackouts during defendant's army service. However, said information was, balanced against defendant's military record. Defendant was not free to simply pick and choose which parts of the report would be used. Hence, counsel's tactical

strategy cannot be said to have fallen below an objective standard of reasonable representation.

Defendant also argues his counsel was, ineffective for introducing the written statement of Edward Espinoza. However, the statement was introduced to show inconsistencies between Espinoza's testimony and the written statement. All the information harmful to defendant was introduced in the state's case-in-chief. Defendant has identified no information in the written statement that was not already before the court. Therefore, defendant has shown neither error nor prejudice. *Strickland, sunra.*

Defendant also contends it was error when his counsel found no inconsistencies between the statement of James Russell and his testimony. Actually, defendant's counsel stated there were no *material* inconsistencies. Defendant has failed to identify any inconsistencies. A review of James Russell's statement supports defense attorneys' assertion of no *material* inconsistencies. Therefore, defendant has failed to demonstrate counsel made any error.

Finally, defendant contends his trial counsel was ineffective for not trying to suppress the identification statements of Carolyn Rosel, James Russell and Adam Flanik. Defendant argues these witnesses made their identification based on the showing of a single photograph. Defendant further contends this was a suggestive procedure. The evidence reveals the majority of the witnesses involved knew defendant prior to this incident and had ample opportunity to observe defendant concerning their testimony. Rosel and Russell saw defendant walk through their house with a knife in his hand. In addition, the witnesses were thoroughly cross-examined by defense counsel on this point.

The Sixth Amendment does not require defense counsel to file suppression motions in every case. *State* v. *Flors* (1987), 38 Ohio App. 3d 133, 139 citing *Kimmelman* v. *Morrison* (1986), 477 U.S. 365.

Furthermore, the Ohio Supreme Court has held in *State* v. *Moody* (1978), 55 Ohio St. 2d 64, 67 [9 O.O.3d 71]:

"Although the identification procedure may have contained notable flaws, this factor does not, *per se*, preclude the admissibility of the subsequent in-court identification. See *State* v. *Barker* (1978), 53 Ohio St. 2d 135, 142-143 [7 O.O.3d 213]. As noted *Manson* v. *Brathwaite* (1977), 432 U.S. 98, 53 L.Ed.2d 140, 154, '*** reliability is the linchpin in determining the admissibility of identification testimony ***.'

The factors affecting reliability include 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' *Neil* v. *Biggers* (1972), 409 U.S. 188, 199. Thus, although the identification procedure is suggestive, so long as the challenged identification itself is reliable, it is admissible. *Manson, supra,* at 151." *State* v. *Merrill* (1984), 22 Ohio App. 3d 119, 121.

In the case *sub judice,* defendant was identified by Rosel and Russell. Although these two witnesses did not know defendant prior to this incident, both witnesses had an opportunity to view defendant as he stalked around their house. Flanik, who knew defendant prior to this incident, identified defendant as the person he saw in Keenan's truck with a knife to Klann's throat. The testimony of Espinoza who lived with defendant corroborated Rosel and Russell's testimony. All three showed no uncertainty in identifying defendant. Since the identification was reliable, any suggestiveness in the identification procedure is harmless beyond a reasonable doubt. Therefore, it would have been futile for defendant's counsel to try to suppress the in-court identification.

Defendant has failed to demonstrate the performance of either of his trial counsel was ineffective or that defendant was prejudiced by such ineffectiveness.

Accordingly, defendant's eighteenth assignment of error is not well taken and overruled.

Defendant's nineteenth assignment of error follows:

"THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHTS WHERE THE IMPOSITION OF A DEATH SENTENCE IN THIS CASE VIOLATES VARIOUS CONSTITUTIONAL GUARANTEES, INCLUDING DUE PROCESS OF LAW, THE PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENTS AND STATUTES WHICH ALLOW THE IRRATIONAL, ARBITRARY AND CAPRICIOUS INFLICTION OF THE DEATH PENALTY."

Defendant's nineteenth assignment of error lacks merit.

Defendant contends the death penalty is unconstitutional. Defendant argues the imposition of the death penalty is a violation of contemporary standards of decency. Defendant further argues the grounds for capital sentencing are irrational, arbitrary and unreasonable. Defendant's arguments are unpersuasive.

The Ohio Supreme Court has previously considered and rejected this argument, holding as follows:

"Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the United States Constitution or any provision of the Ohio Constitution." *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, paragraph one of the syllabus.

This was recently affirmed in *Huertas, supra,* as follows:

"[A]ppellant attacks the constitutionality of Ohio's capital punishment scheme. These arguments have been rejected in previous cases. See *State* v. *Spisak* (1988), 36 Ohio St. 3d 80, 521 N.E. 2d 800; *State* v. *Poindexter* (1988), 36 Ohio St. 3d 1, 529 N.E. 2d 568; *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 31 OBR 273, 509 N.E. 2d 383; *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 22 OBR 203, 489 N.E. 2d 795; *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 15 OBR 311, 473 N.E. 2d 264." *Huertas, supra,* at 32.

Accordingly, defendant's nineteenth assignment of error is not well taken and overruled.

It is ordered that appellee recover of appellant its costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

*Judgment affirmed.*

JOHN V. CORRIGAN. J., and SWEENEY, J., concur.

---

[1] Defendant was indicted with two co-defendants; *viz.,* Thomas Keenan and Edward Espinoza. Keenan was tried separately. Espinoza pleaded guilty to a reduced charge.

[2] Thomas Michael Keenan was known as Michael or Mike.

[3] Apparently, defendant knew only the first name of his alleged girlfriend which was Lara. Her last name was supposedly written down and kept in defendant's apartment.